1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

PAUL ENGSTROM,

Defendant.

Case No. 2:15-cr-00255-JAD-PAL

**REPORT OF FINDINGS AND RECOMMENDATION**

(Mot. Suppress – Dkt. #43)

Before the court is Defendant Paul Engstrom's ("Engstrom") Motion to Suppress Statements (Dkt. #43) which was referred to me for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4. The court has considered the Motion (Dkt. #43), the government's Response (Dkt. #50), Engstrom's Reply (Dkt. #55), and evidence presented at an evidentiary hearing conducted February 12, 2016. Susan Cushman appeared on behalf of the government, and Kathleen Bliss appeared on behalf of the Defendant.

**BACKGROUND**

Engstrom is charged in an Indictment (Dkt. #15) returned September 9, 2015, with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C) and possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). The Indictment arises out of an undercover sting operation by a DEA and LVMPD task force directed at co-Defendant Daniel Joseph Dease.

The motion to suppress is based on information produced by the government in discovery. Task Force Officer ("TFO") Detective Stephan Bourque bought MDMA from Dease on May 30, 2015, June 12, 2015, and July 1, 2015. On August 26, 2015, TFO Bourque arranged to purchase five ounces of MDMA from Dease. When Bourque arrived at the meet in his undercover capacity, Dease told Bourque that he did not have the MDMA and needed the buy

1

money up front before his "connect" would release the drugs.  Bourque would not agree to give Dease the money, and after a back-and-forth discussion, Dease and Bourque departed with Dease agreeing to negotiate with his "connect."

Dease sent a "Wickr"[1] text message to Bourque stating that he would sell one ounce at a time.  A surveillance officer observed Dease getting into a parked, silver BMW SUV occupied by an unidentified white male.  Dease later sent a message to Bourque that he had the MDMA.  Bourque arrived in his undercover vehicle, Dease entered Bourque's vehicle and handed over a metallic package containing MDMA in exchange for $1,600.  Dease was arrested.

Simultaneously, officers approached Engstrom who was seated in the BMW SUV.  One task force officer reportedly looked into the back seat of the vehicle and saw a paper Starbucks bag containing four foil bags identical to the foil packages containing the ounce of MDMA Dease gave to TFO Bourque.  The foil bags were seized and Engstrom was arrested.

I.   THE PARTIES' POSITIONS

A.  The Motion to Suppress

The motion to suppress argues that Engstrom's vehicle was stopped without reasonable suspicion or probable cause.  Alternatively, Engstrom argues that even if there was reasonable suspicion for the initial detention, the duration of the stop and search of the interior of the vehicle violated his Fourth Amendment rights.  Engstrom contends that the police lacked probable cause to search the vehicle incident to his detention, and that the foil packages were not in plain view.  Rather, the foil packages of MDMA were contained in a closed container in which Engstrom had a reasonable expectation of privacy.  Engstrom also argues that police lacked probable cause to search the vehicle under the automobile exception to the warrant requirement.  As his arrest was based on evidence seized in violation of his Fourth Amendment rights, the $1,256 seized from his person and personal belongings including the cell phone recovered from the vehicle should be suppressed.

---

[1] "Wickr" is a cellphone application that allows anonymous communications using fictitious names so that law enforcement cannot get them through a search warrant because data communicated is not stored. A timer can be put on the application to delete text messages.  The application only allows for text communications.

1     **B.  The Government's Response**

2     The government opposes the motion arguing the traffic stop of Engstrom's vehicle was

3 supported by reasonable suspicion that criminal activity was afoot based on statements co-

4 Defendant Dease made to the undercover officer on August 26, 2015, and the surveilling

5 officer's corroborating observations.  Officers had reasonable suspicion to detain Engstrom,

6 search his vehicle, and arrest him.  According to the government, an undercover task force

7 officer negotiated with Dease to buy five ounces of MDMA for $8,000, and the sale occurred in

8 the parking lot of Golf Galaxy.  The surveillance team was set up before Dease arrived.  At 4:35

9 p.m., TFO Bourque met with Dease who said he did not have the MDMA and needed to be paid

10 in advance.  TFO Bourque refused to advance any money or to accompany Dease to another

11 location to complete the sale, but told Dease to contact him when he had the MDMA.  At

12 approximately 5:35 p.m., Dease sent TFO Bourque a text message stating his source of supply

13 would meet them in the parking lot at Golf Galaxy.

14     At approximately 5:45 p.m., a silver BMW SUV with Minnesota plates drove into the

15 parking lot.  The driver and sole occupant was later identified as Defendant Paul Engstrom.

16 Surveilling task force officers saw Dease get into Engstrom's vehicle and get out a short time

17 later.  Dease immediately sent a text message to TFO Bourque stating he had the MDMA.  At

18 approximately 5:48 p.m., TFO Bourque arrived in the parking lot and parked next to Dease's car.

19 Dease got into TFO Bourque's car and handed him the ounce of MDMA in exchange for $1,600

20 and Dease was arrested.  Engstrom was detained on the other side of the parking lot.  TFO

21 Hooten recovered four ounces of MDMA in an open Starbucks bag from the rear passenger

22 floorboard of Engstrom's vehicle.  The four packages were wrapped identically to the MDMA

23 that Dease had just sold to TFO Bourque.

24     Based on the totality of the circumstances, the officers had probable cause to conduct a

25 warrantless search of Engstrom's car.  Under the automobile exception to the warrant

26 requirement, police may search compartments, containers, and packages within a vehicle based

27 on probable cause.  Engstrom was lawfully stopped based on reasonable suspicion, his car was

28 lawfully searched, and none of the evidence should be suppressed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.  Defendant's Reply**

Engstrom's Reply argues the government's brief and the investigative reports produced in discovery highlight several factual inconsistencies material to the court's determination of reasonable suspicion and probable cause.  He maintains that under the totality of the circumstances the search of his vehicle and seizure of its contents violated his Fourth Amendment rights.

**II.     THE EVIDENTIARY HEARING**

At the evidentiary hearing, the government called Task Force Officers Detective Stephan Bourque, Specialist Darrell Kurtz, Sergeant Russ Cutulo, Detective Kirk Hooten, and Detective Jack Pope.

The defense did not call any witnesses.  The court canvassed Engstrom, who acknowledged that he had been advised of his rights to testify or not, and had decided after discussing the matter with counsel not to testify.

**A.  Testimony of Detective Stephan Bourque**

Detective Bourque has been employed by the Las Vegas Metropolitan Police Department ("LVMPD") for fifteen years and is currently assigned to a patrol investigation section.  On August 26, 2015, he was working a narcotics case.  He was a narcotics officer between approximately 2007 and 2015, and received specialized training.

In July 2015, he was involved in an operation to purchase MDMA from Defendant Dease.  Bourque met Dease at a bar and spent a lot of time talking with him.  Dease gave Bourque a cellphone application called "Wickr" to communicate with him under the screen name Chessman.  Bourque communicated with Dease through Wickr on multiple occasions and arranged for multiple purchases of MDMA from Dease.

On August 26, 2015, he arranged to meet Dease at the Kohl's parking lot at Durango and Charleston to purchase five ounces of MDMA for $8,000.  Bourque drove to the parking lot area in an undercover police vehicle and met Dease who was already there in a parked car.  Dease got out of his vehicle and entered Bourque's undercover vehicle.  Bourque expected to exchange $8,000 for five ounces of MDMA.  However, Dease said he did not have it.  Bourque was

4

1  frustrated and nervous because Dease kept trying to get him to either front the money or follow

2  Dease to meet his connect who had the MDMA.

3         The meeting with Dease was audio recorded and portions of the conversation were

4  played during the evidentiary hearing.  While Dease was in Bourque's undercover vehicle, Dease

5  said that his connect was at Lifetime Fitness, a gym close by.  Dease told Bourque that he had

6  known his source for twenty years and they were close or "tight."  Dease kept trying to get

7  Bourque to do the deal his way.  Bourque felt uncomfortable with the entire conversation.  Most

8  sources or connects do not want to meet with someone else because they do not know the

9  purchaser or if the buyer is law enforcement or someone intending to rob the source.  Dease was

10  much taller and about 50 pounds heavier than Bourque who was apprehensive for his physical

11  safety.  What ultimately happened was that no deal occurred.  Bourque left the parking lot and

12  told Dease to text him if he could do the deal and drove off.

13         During the meeting, Bourque was supported by surveillance team members and had

14  equipment that allowed the team to hear his conversation with Dease.  Bourque pulled away and

15  went into the Kohl's store in the same parking lot.  He did so because his cover story for meeting

16  in the parking lot was that he needed to buy a dress shirt.  He entered the Kohl's store and a short

17  time later, Dease walked in.   This made Bourque nervous.   He was concerned about a

18  confrontation.  He communicated with his sergeant and was directed to leave the Kohl's store

19  and go to Sahara and Durango where he met up with his boss, Sergeant Russ Cutulo.

20         A short time later, Bourque received a text message from Dease saying he could do the

21  deal, and would get his connect to go to the parking lot.  The message stated that they would do

22  the deal one ounce at a time.  Sergeant Cutulo advised surveillance officers that they would be

23  returning to the Kohl's lot.  After about fifteen minutes, Bourque parked where Dease was

24  parked near the Jack in the Box in the same parking lot where Kohl's is located.  Dease was

25  sitting inside his maroon Mercedes, which was backed into a parking stall.  Bourque parked on

26  his passenger side.  Dease got out of his vehicle, handed Bourque a package that was supposed to

27  be one ounce of MDMA.  Bourque gave Dease the $1,600, and gave the predetermined arrest

28  / / /

signal.  A recording was also made of the second meeting with Dease and portions of the recording were played during the evidentiary hearing.

On cross-examination, Bourque testified that he initially met Dease in a bar with another criminal named Louie.  Bourque communicated with Dease by Wickr.  He took screen shots of text messages with Chessman, Dease's screen name.  He took screen shots with a camera because Wickr messages are set to destruct or delete.  He estimated that he was in the car with Dease on the first occasion for approximately three minutes.  He prepared a police report which was marked and admitted as Defense Exhibit D.  He acknowledged that his report does not say anything about the source being at Lifetime Fitness.  He also acknowledged that he did not take screen shots of his text exchanges with Dease on August 26, 2015.  He could not recall word for word the Wickr texts he exchanged with Dease on August 26, 2015.  In general, he agreed to meet with Dease in the Kohl's parking lot to exchange five ounces of MDMA for $8,000.

**B. Testimony of Specialist Darrell Kurtz**

Darrell Kurtz works for the Drug Enforcement Administration ("DEA") as a telecommunications specialist and has been employed by DEA since 2000.  His responsibilities include operational support to detectives in the field including officer security and collection of evidence.  On August 26, 2015, he was part of an operation for the purchase of five ounces of MDMA in the Kohl's parking lot at Durango and Charleston.  He was in an unmarked van with his equipment and parked at the Shell gas station in three different spots.  He was there waiting for activity and was able to hear what was occurring over the radio.  Other members of the team kept him abreast of what was happening.  He was also videotaping.  The videotape he took was marked and admitted as Exhibit 4.  Portions of the video recording were played during the evidentiary hearing.

Kurtz observed Bourque's undercover vehicle on his right arrive and park next to a red car, which was the target vehicle.  Before the undercover vehicle arrived, Kurtz had seen the red vehicle trolling or driving up and down all over the place throughout the parting lot before it finally settled down and parked next to the undercover vehicle.  The video surveillance tape shows the target getting out of his vehicle and entering the undercover vehicle, remaining for a

short period and then returning to his own vehicle.  Kurtz called out his observations over the radio.  Kurtz also learned over the radio that the deal did not happen, but task force members were still working on trying to get the dope there.  Kurtz stayed where he was initially parked for a while and observed the target vehicle driving around.  He moved his unmarked surveillance vehicle so that it did not stick out.  Sergeant Cutulo called over the radio that the source was going to be bringing the narcotics to the parking lot.

At the second location at which Kurtz was parked, he saw the target's Mercedes pull up next to a silver or gold BMW X5 SUV.  He saw the driver get out of the Mercedes and enter the passenger side of the BMW.  Dease stayed a couple of minutes in the silver or gold SUV, got out, got in his own vehicle, and departed.  After the Mercedes drove away, Kurtz communicated over the radio a description of the BMW and license plate so others on the team could "put eyes on it."  Kurtz's focus was on the undercover deal for officer safety.  Kurtz could not see anything in Dease's hands when he got out of the BMW or when he got into his own vehicle.  Kurtz moved his car to a third location in the same parking lot.

Kurtz testified it was a complete surprise to him that the BMW came into his view.  He called out the description of the BMW and its license plate when it pulled next to the Mercedes so that other task force members could focus their attention on the BMW.  Kurtz had a camera in one hand and a radio in the other hand and could not record the license plate number or the transaction between Dease and the occupant of the BMW on his first observation of it.  Both vehicles were facing away from Kurtz.  Kurtz could see the back of the vehicles and called out the rear license plate on the BMW to other task force members.  At his third location, Kurtz recorded video of the meeting between Dease and the undercover.  The video shows Dease's car parking next to the undercover vehicle near the Jack in the Box.  Dease got out of his car and got into the undercover vehicle.  As Kurtz made his observations, he called out what he saw over the radio.  The video shows a pickup truck that Kurtz believed was Sergeant Cutulo's vehicle.  This was the vehicle Sergeant Cutulo used to escort the undercover officer back to the parking lot.  Dease got out of the undercover vehicle and got in his own car and the arrest team moved in.

/ / /

On cross-examination, Kurtz testified that he was in the Kohl's parking lot approximately 30-40 minutes before everyone else arrived.  He had received a briefing of the location prior to arriving.  He was alone in his van with digital video equipment.  The van contained multiple cameras on the top of the van and he had a 360 degree field of view.  He made observations and manipulated the cameras with a laptop that he kept on his lap.  The laptop controls the cameras and allows him to zoom, pan, tilt, and record.  All of the cameras feed into the laptop he uses for surveillance.

Kurtz reiterated that he moved his vehicle three times because the red Mercedes Dease was driving kept driving around the parking lot and he did not want to stick out.  He saw the red or maroon Mercedes pull into view and pull next to the BMW.  He did not know what the source was driving.  He just knew from what was announced over the radio that the source was coming to the parking lot.  He did not record the first time he saw the BMW because he needed to zoom in on the license plate and give out the license plate over the radio.  He could not see anything going on inside the BMW because the windows were tinted.  He did not record the Mercedes and BMW side by side because he was focused on zooming in on the license plate and calling out the information over the radio.

**C. Testimony of Sergeant Russ Cutulo**

Sergeant Cutulo has been employed by LVMPD for 18 ½ years and has been a sergeant for nine years.  He is currently assigned to a DEA task force and was assigned to the task force in August 2015.  He has been involved in narcotics investigations for approximately 10 years and has specialized training in narcotics.

On August 26, 2015, he was involved in an operation with Detective Bourque.  His duties were overall operational supervision and he was responsible for bringing the undercover in and out of the location and providing safety before and after to make sure the undercover was not followed.  After the initial meeting with the suspect, the undercover went inside Kohl's as part of his cover story.  Bourque contacted Cutulo, who was also in the Kohl's parking lot, indicating that Dease had followed him into the store.  Cutulo pulled into a parking stall in front of the store and told Bourque to leave the store.  They drove to Sahara and Durango where they parked and

8

1    spoke window to window.  Bourque was texting with Dease.  Bourque told Cutulo that Dease

2    agreed to sell one ounce at a time, and that the source would show up to the area with the drugs.

3    This information was relayed to the rest of the surveillance team over the radio.

4         Sergeant Cutulo was driving a Chevy pickup truck and followed Bourque back to the

5    Kohl's parking lot.  Cutulo circled around while Bourque pulled next to Dease's parked vehicle.

6    Cutulo missed the arrest signal, but others heard it over the radio and moved in.  Cutulo also

7    moved in to where Dease was stopped until he was taken into custody.  Cutulo learned about the

8    silver BMW over the radio.  Specifically, he learned that Dease parked next to the silver BMW.

9    Part of the team maintained surveillance on the BMW and Cutulo was aware that the BMW was

10   parked by the Walgreens.

11        On cross-examination, Cutulo testified that the team involved in the operation was a four-

12   man arrest unit and a two-man surveillance team, in addition to the undercover officer.  The

13   BMW was initially observed by the DEA technician, and then others keyed in to keep it under

14   surveillance.  He did not know exactly which task force members surveilled the BMW.

15        **D.  Testimony of Detective Kirk Hooten**

16        Detective Hooten has been employed by LVMPD for 22 years, and is a detective

17   assigned to the Central Narcotics Bureau.  This was his assignment on August 26, 2015.  He has

18   18 years of experience in narcotics in task force, interdiction, street enforcement, and just about

19   every facet of narcotics investigations.  He was part of the operation on August 26, 2015, and

20   assigned in a marked patrol vehicle in uniform with Detective Meegan to assist in the stop if

21   needed.

22        He was parked behind the Kohl's, out of sight from anyone in the parking lot.  He was

23   parked for quite a while before any activity came over the radio.  The surveillance team dictated

24   where the marked patrol car would go.  He was aware that the first deal between the undercover

25   and Dease did not happen and learned that the source would be coming to the parking lot.  He

26   moved his patrol car when the vehicle was identified as the source of supply.  He was asked to

27   take the driver into custody after the undercover deal was done and the bust called out.  The

28   source vehicle was a silver or gold BMW X5 with Minnesota license plates on it.  It was parked

9

1    on the east side of the Walgreens facing west into the building.  Detective Hooten's assignment

2    was to stop this vehicle.  One person was inside.  He identified Engstrom as the person who was

3    inside the BMW.

4          Detective Hooten approached the passenger side of the vehicle.  His partner, Detective

5    Meegan, went to the driver's side.  Hooten's role was to maintain cover.  Hooten opened the rear

6    passenger door when Engstrom was taken into custody to clear the vehicle.  As soon as he

7    opened the rear passenger door, he saw a Starbucks bag with rope handles on the floorboard.

8    Inside were silver foil packages.  He cleared the vehicle for officer safety and advised Detective

9    Pope about the bag found in the rear of the vehicle.  The bag was sitting open and upright.  The

10   packages were visible.  Detective Hooten thought the bags contained coffee, as he was not

11   familiar with foil packages used for narcotics.  Government's Exhibit 7 depicts the Starbucks bag

12   with the rope handles he observed inside the BMW.

13         On cross-examination, Hooten testified that someone on the surveillance team radioed

14   that the BMW vehicle was the source of supply's vehicle.  Information over the radio was that

15   the vehicle was identified with the individual who met with Detective Bourque.  Members of the

16   surveillance team believed it was the vehicle driven by the source of supply.  Detective Hooten

17   was aware the Mercedes had been cruising around the parking lot.  Detective Hooten and his

18   partner made contact with the BMW in the No. 1 spot facing into the Walgreens.

19         Detective Hooten and his partner were there to facilitate the vehicle stop.  He assumed his

20   partner patted Engstrom down, but did not see it.  Detective Hooten approached the vehicle on

21   the passenger side and opened the back passenger door.  He cleared the front, but did not search

22   the vehicle.  The bag was on the floorboard open and clearly visible.  He did not open the bag, he

23   looked into it.  The photograph that was admitted in evidence shows a towel, possibly a paper

24   towel beside and partially covering the bag.  He saw the metallic packages and first thought they

25   were coffee.  He denied he opened the bag and reiterated that he merely looked in the bag.

26   Nothing about the packages made him believe the packages contained drugs.  Engstrom was

27   detained and in custody from the initial contact, but not arrested until the bag was removed from

28   the vehicle.

### E.  Testimony of Detective Jack Pope

Detective Pope has been employed by LVMPD for approximately 24 years.  He has been involved in narcotics investigations since 2004, and has specialized training in all facets of narcotics investigation.  He is the case agent on this case.  On August 26, 2015, he was part of an undercover operation to purchase five ounces of MDMA from Dease.  The plan was to arrest Dease.  He was a member of the surveillance team and monitored everything over the radio.  He was in the Kohl's parking lot before Detective Bourque arrived and saw Dease driving in and out of the parking lot for quite a few minutes before Bourque arrived.

From his vantage point he could not see where Bourque and Dease initially met.  He was just monitoring what was occurring over radio communications.  He knew the first sale did not happen.  When Detective Bourque and Sergeant Cutulo left, the surveillance team followed Dease who drove around the parking lot.  Pope then parked in the same general area near the gas station.  Dease was in the parking lot waiting for the second deal.  Sergeant Cutulo called over the radio that Dease said his source was going to meet him in the parking lot.  Kurtz saw the Mercedes near the Guitar Center and called it out over the radio.  Pope positioned his car so that he could see Dease and the BMW.  Pope saw the Mercedes and the BMW park next to each other.  Kurtz said Dease got into the BMW.  Pope saw Dease get out of the passenger seat of the BMW and get into the Mercedes.  Dease drove away towards where the undercover was parked near the Jack in the Box.  Pope kept visual surveillance on the BMW until the bust out occurred.

Hooten and Meegen got to the BMW before Pope did.  The BMW was parked on the east side of the Walgreens and Pope maintained constant visual surveillance of the BMW the entire time.  He recovered the Starbucks paper bag with the foil packages from the BMW.  Exhibit 7 depicts the Starbucks bag that was found inside the BMW and is the way it appeared when Pope first saw it.  Detective Bourque told Pope how the first deal was packaged, *i.e.*, in a foil package.  Hooten said there were four more foil packages in the Starbucks bag.  Detective Bourque told Pope that the one ounce he purchased was in a foil wrapper when he called the bust out after the first ounce was purchased and Dease was taken into custody.  Engstrom was taken into custody within five minutes of the purchase.

On cross-examination, Pope testified that he observed the BMW and Mercedes on the other side of the Shell gas station in the parking lot. He did not see Dease get into the BMW. He did see Dease get out. Pope was parked near the gas pumps. He did not see anything in Dease's hands. He did not recall whether he put in either of his two reports that he saw the BMW and Mercedes next to each other. He was aware that during the first meeting the source did not want to come to the parking lot because he was going to work out at Life Fitness. Pope was aware there were text exchanges between the undercover and Dease, which advised that the source was coming to the parking lot. Pope believed that the team had surveillance on the Mercedes at all times. He did not see the transaction between Dease and the person in the BMW, but based on his training and experience, believed the source provided Dease with MDMA.

Pope's report describes Wickr texts between Dease and the undercover saying that Dease had the MDMA. The texts were not documented because the undercover was doing the deal and did not have time to take a picture of the screen shots of the texts. Sergeant Cutulo put the information about the source coming to the parking lot over the radio. Pope observed Engstrom being removed from the BMW and joined Hooten and Meegen. Pope pulled behind them as they did the car stop. He saw the back door of the BMW opened by Hooten. He did not believe a paper towel was draped over the Starbucks bag when he first saw it. He acknowledged that the foil bags in the Starbucks bag could have been coffee beans. Pope arrested Engstrom before photos of the bag were taken. There was no search warrant for the car or the bag or its contents.

Because Detective Pope testified he was the individual who arrested Engstrom, the court asked what information Pope had that lead him to conclude he had probable cause to arrest Engstrom. Pope testified that the undercover detective met with Dease who said his source of supply was nearby. Kurtz saw Dease meet with Engstrom. Pope saw Dease go immediately from meeting with Engstrom to the undercover officer. Detective Bourque got one ounce from Dease. Dease was taken into custody. Engstrom was taken into custody. Detective Pope spoke with the undercover who said he bought one ounce. Dease told the undercover he had just come from his source. The task force members saw Dease get into a BMW just prior to meeting with the undercover. Bourque said the MDMA he purchased from Dease was in a silver foil baggie.

Hooten saw four silver foil baggies while clearing the BMW.  Officers were there to purchase five ounces of MDMA.  Finally, Pope also spoke with Dease who said Engstrom was his source.

## DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy.  *Katz v. United States*, 389 U.S. 347 (1967).  The Fourth Amendment protects "people, not places."  *Id.* Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963).

### I.    THE TRAFFIC STOP

A temporary detention of an individual during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809–10 (1996). The Fourth Amendment requires reasonable suspicion to justify a traffic stop.  *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000).  Reasonable suspicion is defined as "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).  The reasonable suspicion standard takes into account "the totality of the circumstances—the whole picture."  *Id.* at 417. This standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

For the reasons explained below, the court finds that the collective knowledge of the officers involved in the uncover operation established probable cause to arrest Enstrom from the point of the initial stop.

### II.    DURATION AND SCOPE OF THE TRAFFIC STOP

Engstrom argues his Fourth Amendment rights were violated by his prolonged detention, which exceeded the permissible scope of the initial stop.

The Supreme Court has held that police contact during an investigatory detention must be reasonably related to the circumstances that initially justified the detention.  *United States v.*

*Sharpe*, 470 U.S. 675, 682 (1985).  An investigative detention must be tailored to its underlying justification and may last no longer than necessary to effectuate the purpose of the stop.  *Florida v. Royer*, 560 U.S. 491, 500 (1983).

Here, the undisputed testimony is that Engstrom was arrested within five minutes of Bourque's purchase of MDMA from Dease.  The court finds that the duration of the stop and detention was not prolonged or exceed the permissible scope of the initial stop.

### III.   PROBABLE CAUSE

Probable cause to support an arrest is "a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  The existence of probable cause is determined by an analysis of the totality of the circumstances surrounding the intrusion.  *Id*. Probable cause does not deal with hard certainties, but with probabilities.  *Id*. at 241.  Probable cause to search exists if there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238.  Probable cause for an arrest and search incident to arrest exists if, under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed the crime. *United States v. Struckman*, 603 F 3d. 731, 739 (9th Cir 2010).

Probable cause is not evaluated in hindsight based on what the search does or does not uncover.  *Florida v. Harris*, 133 S.Ct. 1050, 1055–56 (2013).  A police officer has probable cause to conduct a search when the facts available to him warrant a reasonable person in believing that contraband or evidence of a crime is present.  *Id.*  An officer evaluating whether reasonable suspicion is present is entitled to draw on his or her "own experience and specialized training to make inferences from and deductions about the cumulative information available." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Applying these principles, the court finds the task force members engaged in the investigation in this case had ample probable cause to arrest Engstrom and search the vehicle for contraband.  Detective Bourque had made three undercover purchases of MDMA from Dease before arrangements were made to buy five ounces of MDMA from Dease on August 26, 2015.

1    According to DEA Specialist Kurtz's testimony, Dease arrived in the Kohl's parking lot

2    approximately 30 to 40 minutes before Bourque arrived.[2]  Dease was observed driving around

3    the parking lot before Bourque arrived and after Bourque departed.  During the initial meeting,

4    Dease did not have the MDMA and wanted Bourque to "front" the money or follow him to

5    where his connect was at a nearby Lifetime Fitness gym.  Dease kept trying to get Bourque to

6    either front him the money for all five ounces or to follow him to where the connect was.

7    Bourque refused and the two agreed that Dease would negotiate with his connect for

8    arrangements to make the deal.

9         Bourque entered the Kohl's store to maintain his cover and was directed by Cutulo to

10   leave the Kohl's store when Dease entered the store.  Cutulo followed Bourque and the two

11   spoke near Sahara and Durango.  While Bourque and Cutulo were talking, Dease sent a text to

12   Bourque indicating his connect would come to the Kohl's parking lot and the deal would be done

13   one ounce at a time.  Dease remained in the Kohl's parking lot waiting for the source to arrive.

14        Information that the source would be coming to the Kohl's parking lot with the MDMA

15   was announced over the radio.  DEA technician Kurtz observed the BMW arrive in the parking

16   lot approximately 15 minutes later.  Kurtz saw the BMW Engstrom was driving pull next to the

17   Mercedes Dease was driving.  Kurtz observed Dease get out of the Mercedes and enter the BMW

18   and then get out of the BMW a short time later.  Kurtz called out a description of the BMW with

19   Minnesota license place over the radio.  Detective Pope also saw the BMW Engstrom was

20   driving pull next to Dease's red Mercedes, get out of the Mercedes, enter the BMW, and then

21   observed Dease go immediately to where the undercover officer was parked.  Dease immediately

22   got out of his Mercedes and got into the undercover vehicle.  Kurtz video recorded the meeting

23   between Dease and the undercover, and called out his observations to other team members.

24   Bourque bought the one ounce from Dease wrapped in a foil package and gave the arrest signal.

25

26   _____

27   [2] The witnesses referred to various locations where observations were made and vehicles were parked in the Kohl's parking lot.  The area contains a shopping center with a large parking lot on Charleston and Durango.  Kohl's is the largest store in the lot which also contains a Shell gas station, Jack in the Box,

28   Walgreens, Golf Galaxy and a guitar store.

1    The marked patrol vehicle driven by Hooten and his partner, Detective Meegan,

2    immediately blocked Engstrom's BMW.  Detective Pope pulled directly behind the patrol car

3    and spoke with Detective Bourque who said he had just purchased one ounce of MDMA from

4    Dease in a silver foil baggie. Detective Pope testified that he arrested Engstrom within 5 minutes

5    after the sale occurred.

6    The court finds that under the totality of the circumstances there was ample probable

7    cause to arrest Engstrom and search the BMW for contraband.  Dease was in the parking lot to

8    sell five ounces of MDMA to Bourque for $8,000.  Dease did not have the MDMA in his first

9    meeting with the undercover.  After the first unsuccessful meeting, Dease texted Bourque to say

10   his connect was nearby and would be coming to the Kohl's parking lot.  Dease remained in the

11   parking lot waiting until Engstrom arrived in his BMW.  Dease got out of his vehicle and into the

12   BMW for a short time.  Dease went directly from the BMW to park next to Bourque.  Dease got

13   into the undercover vehicle with MDMA, and sold it to Bourque for $1600.  There was probable

14   cause to believe that Engstrom was the source of the MDMA Dease sold to Bourque. The second

15   meeting between Dease and Bourque was set up to sell five ounces of MDMA one ounce at a

16   time.  Once the first transaction occurred it was objectively reasonable for the police to believe

17   Engstrom's BMW contained more MDMA.

18   Because the court finds task force officers had probable cause to arrest Engstrom and

19   search the BMW the court need not address Engstrom's remaining arguments about whether the

20   Starbuck's bag and its contents were in "plain view" or whether Detective Hooten "cleared" the

21   BMW for officer safety or searched it.

22   For these reasons,

23   **IT IS RECOMMENDED** that the Motion to Suppress (Dkt. #43) be **DENIED.**

24   DATED this 2nd day of March, 2016.

25

26   _____

27   PEGGY A. LEEN
     UNITED STATES MAGISTRATE JUDGE

28